## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JOSE GONZALEZ GOMEZ ET AL.,**

   **Plaintiffs,**

   **v.**

              **Case No. 22-CV-2198-JAR**

**EPIC LANDSCAPE PRODUCTIONS, L.C.;**
**JOHN CONSTANT; MARTY SILER; AND**
**EPIC LANDSCAPE PRODUCTIONS, INC. ,**

   **Defendants.**

### MEMORANDUM AND ORDER

Plaintiffs, currently or formerly employed by Defendants as lawn and landscape workers, bring this class and collective action for unpaid overtime pay.  Plaintiffs assert claims under the Fair Labor Standards Act ("FLSA")[1] and the Missouri Minimum Wage Law ("MMWL")[2] alleging that Defendants failed to pay overtime compensation for all hours worked in excess of 40 in a workweek.  Defendants assert that they were not required to pay overtime to Plaintiffs because all Plaintiffs are exempt from the overtime requirements of these statutes under the Motor Carrier Act exemption and/or the agricultural exemption.  Plaintiffs also assert claims based on state contract law theories, alleging that Defendants promised to pay overtime in the H-2B visa applications Defendants submitted to the Department of Labor (DOL).

This matter is now before the Court on Defendants' motion for summary judgment (Doc. 298) and Plaintiffs' motion for partial summary judgment (Doc. 303).  For the reasons stated in more detail below, the Court grants in part and denies in part Defendants' motion and grants in

---

[1] 29 U.S.C. § 201 et seq.

[2] Mo. Rev. Stat. § 290.505.

part and denies in part Plaintiffs' motion. Specifically, the Court grants summary judgment in favor of Defendants on Plaintiffs' breach of contract, third-party beneficiary and unjust enrichment claims and on the issue of whether Defendant Epic Landscape Productions, Inc. is an employer for purposes of the FLSA and the MMWL. Defendants' motion is otherwise denied. The Court grants summary judgment in favor of Plaintiffs on the applicability of the agricultural exemption to the FLSA and MMWL. Plaintiffs' motion is otherwise denied.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[7]

---

[3] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[4] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5] *Bones v. Honeywell Int'l, Inc*., 366 F.3d 869, 875 (10th Cir. 2004).

[6] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Thomas v. Metro. Life Ins. Co*., 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8] Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."[12] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

"Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[14] Cross summary judgment motions should be evaluated as two separate motions.[15] Just because the Court denies one does not require that it grant the other.[16]

---

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[9] *Anderson*, 477 U.S. at 256

[10] *Id.*; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[12] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[13] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citations omitted).

[14] *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[15] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[16] *Id.*

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[17]

## II.    Facts

The following facts are either uncontroverted or related in the light most favorable to the non-moving party.  The Court disregards conclusory allegations without specific supporting facts that do not have probative value[18] and "statements of mere belief."[19] The Court does not consider legal arguments included in the parties' statements of facts.

Defendant Epic Landscape Productions, L.C. ("Epic") is a landscaping company formed in 1991.  Defendant John Constant started Epic, and Defendant Marty Siler joined as a co-owner several years later.  Donald Chapman served as Epic's Chief Financial Officer from August 1999 until his retirement in January 2021.  Mr. Chapman is an attorney, and he also served as Epic's in-house counsel.  Mr. Chapman was responsible for compliance with Department of Transportation matters and other issues relating to employment law.  During the relevant time period, Anne Spachman was employed as Epic's Human Resources Director.  Viewed in the light most favorable to Plaintiffs, the evidence reflects that Mr. Constant, Mr. Siler, Mr. Chapman and Ms. Spachman all participated in varying degrees to determine Epic's overtime policies.

---

[17] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[18] *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005) (citations omitted).

[19] *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

At the time pertinent to this case, Epic had three locations in the Kansas City area—one location in Gardner, Kansas; one location in Olathe, Kansas; and one location in Kansas City, Missouri.  Epic consists of two divisions: the Landscape Production division and the Lawn Maintenance division.  The Landscape Production side of Epic performs landscaping and construction work such as planting plants, building retaining walls, installing irrigation systems, and installing lighting systems. The Landscape Production division also includes a nursery, located in Gardner.  The Lawn Maintenance side of Epic provides, among other things, mowing services, fertilizer serves, tree pruning, mulching and annual flower services.  Epic provides its lawn and landscape services to commercial and residential clients.  Epic's workers are not hired for or assigned to a particular division and they may be scheduled to work in either division depending on need and staffing issues.

Workers employed in both divisions spend some amount of time each day loading Epic's trucks and trailers with equipment, planting material, or other items depending on the services scheduled for a given day. These loading activities are repeated between job sites.  Loads are secured with straps and tarps as needed.  While the record reflects that Epic's managers perform a final safety check before trucks are cleared to exit Epic's gate, there is some evidence that lawn and landscape laborers assist in routine safety checks during and after the loading process. Epic's trucks are driven by foreman-laborers on a daily basis and those trucks almost always have a trailer attached.  Because of Epic's proximity to the state line, Epic's workers cross between Kansas and Missouri when traveling to and from worksite on occasion.

Through the relevant time period, Defendants hired their lawn and landscape workers both locally and through the H-2B visa program.  As explained by another district court, an employer seeking to participate in the H-2B program

5

must file a prevailing wage request with the DOL. The DOL then makes a
prevailing wage determination (PWD) for the particular job position the
employer needs filled. The employer is then required to advertise the position
to all potential workers at a wage at least equal to the PWD. If insufficient
U.S. workers apply, the employer then files an Application for Temporary
Employment Certification with the DOL. If after complying with all of the
regulatory requirements, the DOL is satisfied that there are insufficient U.S.
workers qualified for the H-2B position, the DOL certifies the employer's
need for foreign workers for the period requested. The employer then petitions
U.S. Citizenship and Immigration Services within the Department of
Homeland Security to grant the visa application. If the petition is granted, the
employers either directly or through local recruitment agencies begin the
process of recruiting the workers in their home countries.[20]

According to the Department of Labor, the purpose of the H-2B labor certification program is to "balance the needs for temporary, seasonal foreign workers" against "the need to protect U.S. workers' jobs, wages, and working conditions."[21]  Consistent with this purpose, the PWD "requires employers to recruit U.S. workers at a wage rate that is not artificially depressed by the importation of temporary foreign labor."[22]

In 2017, 2018, 2019, and 2020, Defendants submitted Applications for Temporary Labor Certification (Form ETA-9142B) for landscaping and groundskeeping workers.  In each year, they submitted at least two Applications (filing subsequent applications presumably after realizing they needed additional workers).  In connection with those Applications, Defendants were required to submit a copy of the Job Order that was utilized to post the job openings locally.  Those job orders, completed by Defendants or a third-party agent assisting Defendants with the H-2B process, assert that overtime hours are available (but not required) to landscape laborers.  In other parts of the Applications, Defendants or their agent set forth an overtime

---

[20] *Jimenez v. GLK Foods LLC*, No. 12-CV-209, 2016 WL 2997498, at *3 (E.D. Wis. May 23, 2016) (citations omitted).

[21] *Calixto v. Walsh*, No. 19-1853-CKK, 2022 WL 4446383, at *15 (D.D.C. Sept. 23, 2022) (quoting 85 Fed. Reg. at 14,709 (AR 4725)).

[22] *Id.*

wage rate and indicated that overtime hours were available.  Each year, Defendants hired

numerous workers through the H-2B visa application process, and many workers returned to

work for Defendants on an H-2B visa for consecutive years. Despite the references to overtime

hours and overtime rates in Defendants' Applications for Temporary Labor Certification,

Defendants did not pay overtime rates for hours worked in excess of 40 hours in a workweek at

any time during the 2017-2020 landscaping seasons.  There is no evidence that any H-2B

workers ever saw Defendants' Applications and no evidence that Defendants ever told any H-2B

workers that they would receive overtime pay.[23]

       This case largely turns on whether Defendants properly classified their lawn and

landscape laborers as exempt from overtime requirements under the Motor Carrier Act ("MCA")

exemption and/or the agricultural exemption.  According to Plaintiffs, Defendants' lawn and

landscape workers spent the vast majority of their workdays engaged in manual labor and that

any time spent doing work that might be considered exempt was de minimis.  According to

Defendants, lawn and landscape laborers performed just enough exempt activities to satisfy the

MCA and/or agricultural exemptions.  Plaintiffs' contract claims hinge on whether Defendants'

"promises" of overtime pay in their Applications for Temporary Labor Certifications constitute a

term of the H-2B workers' employment with Defendants.

       Additional facts will be provided as they relate to the specific arguments raised by the

parties in their submissions.

---

[23] It is undisputed that Defendants did not pay any overtime to their lawn and landscape workers until July 4, 2021.

### III.     FLSA Claims

Section 207 of the Fair Labor Standards Act requires employers engaged in interstate commerce to pay employees one-and-one-half times their regular rate of pay for all overtime hours worked (*i.e*., all hours over 40 hours during a seven-day work week).[24]  An employer is relieved of the overtime-pay requirement if it proves the application of one or more of the FLSA's many exemptions for certain classes of employees.[25]  Plaintiffs allege in the pretrial order that Defendants violated the FLSA by failing to pay them overtime compensation for all hours worked in excess of 40 hours in a workweek.  Defendants admit that they did not pay overtime to Plaintiffs until July 4, 2021, but they contend that they were not required to pay overtime because all Plaintiffs fall under the Motor Carrier Act exemption of the FLSA and, in addition, some Plaintiffs fall under the agricultural exemption of the FLSA.[26]  As the Supreme Court of the United States held earlier this year, "the preponderance-of-the-evidence standard applies when an employer seeks to show that an employee is exempt from the minimum-wage and overtime-pay provisions of the Fair Labor Standards Act."[27]  In addition, FLSA exemptions must

---

[24] *Jordan v. Maxim Healthcare Servs., Inc*., 950 F.3d 724, 727 (10th Cir. 2020) (citing 29 U.S.C. § 207(a)(1)).

[25] *Id.*

[26] 29 U.S.C. § 213(b)(1) (Motor Carrier Act exemption) & § 213(b)(13) (agricultural exemption).

[27] *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 54 (2025).

not be construed narrowly against an employer but rather must be given a "fair reading."[28] The burden is on Defendants to show that the claims exemption applies.[29]

### A. Motor Carrier Act Exemption

Defendants assert in the pretrial order that all Plaintiffs are exempt from overtime pay under the Motor Carrier Act ("MCA") exemption. That exemption excuses common and private motor carriers from their obligation to pay overtime to any employee over "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to" the Motor Carrier Act.[30] In turn, the Secretary of Transportation has power over an employee of a motor carrier only where "the employee in the performance of his duties moves goods in interstate commerce and affects the safe operation of motor vehicles on public highways."[31] Four classes of employees are typically covered by the MCA exemption if their work directly affects the safety of motor vehicles in interstate commerce: drivers, driver's helpers, loaders, and mechanics.[32] To determine whether an employee falls into one of the covered employee

---

[28] *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018). Plaintiffs assert in their motion that FLSA exemptions must be narrowly construed, but that is no longer the law in light of *Encino*. Plaintiffs further assert that Defendants must prove that an employee falls "plainly and unmistakably" within the exemption. Plaintiff suggests that this standard refers to Defendants' burden of proof. It does not. *See Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157-58 (10th Cir. 2012) ("In sum, our cases stand for the proposition that in considering an FLSA exemption, a court must find that the claimed exemption falls 'plainly and unmistakably' within the terms of the statute—not for the proposition that an employer need prove such an exemption by anything more than a preponderance of the evidence."); *see also Jordan*, 950 F.3d at 733 (assuming without deciding that *Encino* "renounced" the plainly-and-unmistakably standard).

[29] *E.M.D. Sales*, 604 U.S. at 48 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974)).

[30] *Kelley v. Alpine Site Servs., Inc.*, 110 F.4th 812, 814 (5th Cir. 2024) (citing 29 U.S.C. § 213(b)(1); 49 U.S.C. § 31502(b)(1)–(2); 29 C.F.R. § 782.2).

[31] *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1154 (10th Cir. 2016) (quoting *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993)).

[32] *Kelley*, 110 F.4th at 815 (citing 29 C.F.R. § 782.2(b)(1)–(2)).

categories, "'neither the name given to his position nor that given to the work that he does is controlling;' it is the character of his job duties and activities."[33]

Both parties move for summary judgment on the application of the exemption. The threshold issue raised by both parties in their briefs is how much time Plaintiffs—who admittedly are not hired to perform safety-affecting activities and spend the majority of their time performing manual labor such as mowing and landscaping—must spend on safety-affecting activities to fall within the exemption. Defendants argue that the law does not require that employees spend a certain minimum amount of time performing activities affecting the safety of operation—any amount of time is sufficient to satisfy the exemption. According to Defendants, it matters not that Plaintiffs were primarily employed as landscape laborers because Plaintiffs also worked to some extent as Drivers, Driver's Helpers, Loaders or Mechanics within the meaning of the DOT regulations such that all Plaintiffs were engaged in activities directly affecting the safe operation of motor vehicles on public highways.[34] Plaintiffs, in their motion, assert that Plaintiffs must spend "more than de minimis" time on safety-affecting activities to fall under the exemption. As will be explained, the Court rejects Defendants' argument, which is based on a misunderstanding of pertinent case law. The Court also rejects Plaintiffs' "de minimis" standard in this context. Moreover, even if the Court adopted the parties' standards for measuring the requisite amount of time that Plaintiffs must spend on safety-affecting activities, the Court would deny summary judgment to both parties because their evidence on these issues is deficient.

---

[33] *Id.* (quoting 29 C.F.R. § 782.2(b)(2)).

[34] Defendants also assert that Epic is a motor carrier subject to DOT jurisdiction and that the small vehicle exception to the MCA exemption does not apply. *See* SAFETEA–LU Technical Corrections Act of 2008, Pub. L. No. 110-244, § 306(a), 122 Stat. 1572, 1620–21 (2008). Because Defendants have not otherwise established as a matter of law that the MCA exemption applies, the Court declines to address these issues at this juncture.

For their argument that the amount of time an employee spends engaged in safety-affecting activities does not matter, Defendants rely on the Supreme Court's decision in *Morris v. McComb*[35] to suggest that the MCA exemption applies to workers who spend as little as 4 percent of their time engaged in such activities. The Fourth Circuit in *Troutt v. Stavola Bros*. rejected this interpretation of *Morris* in the face of a similar argument:

> [T]he principal issue in *Morris* was not whether an employee's activities affected safety of operation, but the very different question of whether the motor carrier provided transportation in interstate commerce. *Morris* held that a motor carrier, which conducted only 4% of its business in interstate commerce but which was required, by "virtue of that status" as a licensed carrier to accept interstate business, was covered by the Motor Carrier Act. All of the carrier's "drivers and these 'mechanics' whose work affect[ed] the safety of transportation," who were concededly employed full time as such and who "shared indiscriminately" interstate assignments, were held covered by the Motor Carrier Act, even though two of the drivers in a given year performed all of their work in intrastate commerce.[36]

In *Morris*, the drivers and mechanics worked full-time as drivers and mechanics and, in fact, it was conceded in that case that the work of the carrier's drivers and mechanics affected "the safety of transportation."[37]  *Morris*, then, does not bear on the question of how much time employees who do not regularly work as drivers, driver's helpers, loaders and mechanics must spend on those activities to fall under the exemption.

Defendants' reference to the Tenth Circuit's case in *Starrett v. Bruce* is unpersuasive for the same reason.[38] According to Defendants, *Starrett* supports the conclusion that "it is not the amount of time an employee spends in work affecting safety, rather it is what he may do in the time thus spent, whether it be large or small, that determines the effect on safety." While that

---

[35] 332 U.S. 422 (1947).

[36] *Troutt v. Stavola Bros*., 107 F.3d 1104, 1109 (4th Cir. 1997) (internal footnote and citations omitted).

[37] *Id*. (citing *Morris*, 332 U.S. at 431).

[38] 391 F.2d 320 (10th Cir. 1968).

quote appears in *Starrett*,[39] Defendants misconstrue the meaning of it.  *Starrett* is akin to *Morris* in that the primary question before the Circuit was whether the trucking company was a common carrier engaged in interstate commerce when the company did not actually perform any interstate transportation.[40]  The Circuit held that the company was a common carrier engaged in interstate commerce because it held itself out to the general public as being available for interstate hauls and actively solicited interstate business.[41]

The plaintiff in that case, a full-time truck driver, argued alternatively that regardless of whether the company was a common carrier in interstate commerce, the plaintiff himself was not exempt because he performed no interstate driving.[42]  The Circuit rejected this argument, highlighting that the proportion of time spent driving interstate versus driving intrastate was not important for purposes of the exemption:

> It is however the character of the employee's activities rather than the proportion of either his time or his activities that determines the actual need for the Commission's power to establish qualifications and maximum hours of service. The Interstate Commerce Commission is concerned with the maintenance of safety in interstate and foreign commerce, and its restrictions on the number of hours which those who so engage may work in any one workweek is obviously intended to prevent accidents due to fatigue, without regard to consideration of adequacy of compensation. As a practical matter it is not the amount of time an employee spends in work affecting safety, rather it is what he may do in the time thus spent, whether it be large or small, that determines the effect on safety. Ten minutes of driving by an unqualified driver could do more harm on the highway than a month of driving by a qualified one.[43]

---

[39] *Id.* at 323.

[40] *Id.* at 322-23.

[41] *Id.* at 323.

[42] *Id.*

[43] *Id.* (citations omitted).

As the Supreme Court did in *Morris*, the Circuit in *Starrett* emphasized that even though the company did not obtain interstate work, all of its truck drivers "were assigned indiscriminately and all would have actually driven in interstate commerce if such hauls had been obtained" by the company and even the plaintiff-driver who had never driven interstate could have been called upon to do so. [44]  In other words, like *Morris*, the key in *Starrett* is that if the employer is a common carrier in interstate commerce, the specific amount of time that an individual driver spends driving *in interstate commerce* is not dispositive of whether the exemption applies to that driver; the important factor is whether the employee could be called upon at any time to transport goods in interstate commerce.  Neither *Morris* nor *Starrett*, then, advance the argument espoused by Defendants. Because Defendants have not persuaded the Court that Plaintiffs may be exempt under the MCA exemption even if they spend only de minimis time on driving, helping, loading and mechanic activities (and the rest of their time on activities wholly unrelated to these activities such as landscape work), the Court denies their motion for summary judgment on the MCA exemption.

Plaintiffs, in turn, argue that all Plaintiffs were hired as landscape laborers and spent the vast majority of each working day performing manual labor wholly unrelated to the safe operation of motor vehicles on public highways. According to Plaintiffs, to the extent any Plaintiffs engaged in safety-affecting activities, the time spent by Plaintiffs on those activities was de minimis.  Plaintiffs contend that the law requires that an employee spend "more than de minimis" time on activities affecting the safety of operation before that employee is deemed exempt.  Based on their argument that Plaintiffs spent only de minimis time on safety-affecting

---

[44] *Id.*

activities, Plaintiffs move for summary judgment in their favor on the MCA exemption's application here.

Plaintiffs cite a variety of different rules to support its "de minimis" standard but none that apply in this context.[45]  For example, Plaintiffs point to a regulation concerning the agricultural exemption for the idea that if an employee performs any nonexempt work in a workweek, the exemption does not apply.[46]  This regulation has no bearing on the MCA exemption.  Plaintiffs also direct the Court to a regulation concerning exemptions relating to fishing and aquatic products for the idea that an exemption is lost if an employee spends more than 20 percent of his or her time doing nonexempt work.[47]  This regulation not only does not support a de minimis standard but has no application here in any event. More specifically, Plaintiffs have not articulated to the Court how the rules set forth in these regulations concerning other exemptions might be helpful or sufficiently analogous for purposes of analyzing the MCA exemption.

The three cases cited by Plaintiffs are similarly unhelpful.  One addresses the amount of work that employees must perform on vehicles weighing 10,000 pounds or less for purposes of analyzing the small vehicle exception to the MCA exemption (the plaintiffs in that case did not dispute that the MCA exemption applied to them absent the small vehicle exception).[48]  One involves the application of California labor laws and the sole issue on summary judgment turned

---

[45] In their brief, Plaintiffs mention and briefly discuss the Small Vehicle Exception to the MCA exemption. The Court does not read this section of the brief as a request for summary judgment in Plaintiffs' favor on the applicability of the Small Vehicle Exception but rather an example provided by Plaintiffs of various courts utilizing the de minimis standard in connection with the exception.

[46] 29 C.F.R. § 780.11.

[47] 29 C.F.R. § 784.116.

[48] *Aikins v. Warrior Energy Servs. Corp.*, No. 6:13-CV-54, 2015 WL 1221255, at *1 (S.D. Tex. Mar. 17, 2015).

on whether and to what extent a driver regularly transported hazardous waste as opposed to non-hazardous materials.[49]  The third case, *Villegas v. Dependable Constr. Servs.*,[50] discussed the de minimis rule in the context of the MCA exemption, but it demonstrates the difficulty courts have had in applying that rule consistently.  As another district court has explained,

> It appears that courts refer to "de minimis" activities for three possible purposes: (1) to find that the employee's activities in relation to safety in interstate commerce may be so trivial as to take the employee out of the motor carrier exemption; (2) to permit an employer to take advantage of the motor carrier exemption on the mere showing that the employee's activities in relation to safety in interstate commerce are more than de minimis; and (3) to refuse to apply the motor carrier exemption altogether if can be shown that the employer's activities in interstate commerce are de minimis in relation to the employer's activities overall.[51]

The court in *Villegas*, noting that the employees in that case "drove only incident to their construction duties," began its discussion of the de minimis rule by citing to the Supreme Court's decision in *Pyramid Motor Freight Corp. v. Ispass*.[52] In *Pyramid*, the Court held that an employee's placing of articles of freight on a motor carrier truck may form "so trivial, casual or occasional a part of an employee's activities" that his activities will not come within the kind of "loading" described in the governing regulations as governing the "safety of operations."[53] As the First Circuit has pointed out, the Court in *Pyramid* "was concerned with the question of whether the substantial part of the employee' [loading] activities which affected interstate commerce also affected safety . . . . This is a different issue than the question of whether a

---

[49] *Wamboldt v. Safety-Kleen Sys., Inc.*, No. C 07-0884 PJH, 2007 WL 2409200, at *8 (N.D. Cal. Aug. 21, 2007).

[50] No. 4:07-cv-2165, 2008 WL 5137321 (S.D. Tex. Dec. 8, 2008).

[51] *Williams v. Tri-State Biodiesel*, L.L.C., No. 13 CIV. 5041 GWG, 2015 WL 305362, at *12 (S.D.N.Y. Jan. 23, 2015).

[52] 330 U.S. 695 (1947).

[53] *Williams*, 2015 WL 305362, at *12 (quoting *Pyramid*, 330 U.S. at 708).

substantial part of all the employee's activities interstate and intrastate, affect interstate commerce."[54] The de minimis rule laid out in *Pyramid*, then, does not apply to the issue here. Moreover, the *Villegas* court ultimately declined to apply the de minimis rule and stated that even if the plaintiffs drove only incident to their construction duties, they would likely qualify as exempt "if there is evidence of frequent interstate trips wherein each plaintiff drove the employer's tools to job sites."[55] *Villegas*, then, does not help the Plaintiffs here and Plaintiffs have not persuaded the Court, through their limited argument, that the "de minimis" standard applies in this case.[56]

Even assuming the Court accepted Plaintiffs' argument that Defendants must establish that Plaintiffs spend more than de minimis time on safety-affecting activities to fall within the exemption, material factual disputes exist on that issue. In fact, Plaintiffs' own evidence reveals factual disputes about whether Plaintiffs spent de minimis time or something more. Plaintiffs urge that they spend more than 90 percent of their working days doing manual labor. They cite to just two pieces of evidence for this assertion. The first is what they refer to as an "executive summary" prepared by counsel under Federal Rule of Evidence 1006 that purports to summarize over 1200 pages of "productivity reports" produced by Defendants.[57] Defendants object to this

---

[54] *Id.* (quoting *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 209 (1st Cir. 1972)).

[55] 2008 WL 5137321, at *24.

[56] In all likelihood, the relevant question in the context of this case, at least with respect to loading activities, is whether Plaintiffs spent a substantial part of their working hours performing safety-affecting activities. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649 (1947). The principal issue in *Levinson* was whether the ICC had jurisdiction over a "partial-duty loader"—that is, a worker who spent a "substantial part" of his working hours loading and unloading motor vehicles and transferring freight but spent the rest of his time doing other activities that did not have an effect on the safety of motor vehicle transportation operations. *Id.* at 681. The Court held that the ICC had jurisdiction over workers who spend a "substantial" amount of their time doing the work of loaders. *Id.* at 685. The parties here have not marshaled the evidence in a way—let alone applied that evidence to pertinent case law—that permits a determination as to whether Plaintiffs spent a substantial part of their working time performing these activities.

[57] This executive summary is referred to by Plaintiffs as Exhibit 11. It is in the summary judgment record as Doc. 303-7.

exhibit on the grounds that Plaintiffs have failed to establish a proper foundation for it.  Plaintiffs have not addressed Defendants' objection in their reply brief.

Fed. R. Evid. 1006 provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."[58] However, "[i]n order for a summary to be admissible, it must be drawn from records that are otherwise admissible."[59]  Rule 1006 "[s]ummaries must be accurate and non-prejudicial,"[60] and must be "limited to what is actually within the content of the underlying documents. The summaries shall not include any testimonial, interpretive, or inferential statements drawn from the content of the underlying documents."[61] Plaintiffs have not submitted a declaration or any other evidence showing who prepared the summary or how that summary was prepared.  In the absence of a proper foundation, the Court cannot assess whether the summary is accurate.[62]  The Court finds that Plaintiffs have failed to establish the proper application of Rule 1006.  The Court, then, disregards this exhibit.

---

[58] Fed. R. Evid. 1006.

[59] *Trans-Rim Enters. (USA), Ltd. v. Adolph Coors Co*., No. 94-1236, 1995 WL 231381, at *3 (10th Cir. Apr. 7, 1995) (citing *Harris Mkt. Research v. Marshall Mktg. and Comm'ns, Inc*., 948 F.2d 1518, 1525 (10th Cir. 1991); 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 1006[03] (1994)); *see also United States v. Channon*, 881 F.3d 806, 810 (10th Cir. 2018) (citing *United States v. Irvin*, 682 F.3d 1254, 1261 (10th Cir. 2012)) ("Although the information upon which a Rule 1006 summary is created need not itself be admitted into evidence, it must still be admissible.").

[60] *Daniel v. Ben E. Keith Co*., 97 F.3d 1329, 1335 (10th Cir. 1996); *see also State Office Sys., Inc. v. Olivetti Corp. of Am*., 762 F.2d 843, 846 (10th Cir. 1985) ("[A] summary of business records should not be admitted if it mischaracterizes or inaccurately reflects the documents it purports to summarize.").

[61] *Griddine v. GP1 KS-SB, Inc*., No. 2:17-CV-02138-JAR, 2019 WL 1002049, at *7 (D. Kan. Feb. 28, 2019).

[62] *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dihmantec*, 529 F.3d 371, 382 (7th Cir. 2008) ("The admission of a summary under Fed. R. Evid. 1006 requires a proper foundation as to the admissibility of the material that is summarized and a showing that the summary is accurate. Judson Atkinson did not address these requirements. It did not establish the admissibility of the records on which the summaries were allegedly based or authenticate the summaries in any way . . . [so] the district court acted within its discretion by striking them.").

That leaves only the documents underlying the executive summary.[63]  But nothing on the face of those reports reflects that Plaintiffs spend more than 90 percent of their working time engaged in manual labor.  Presumably, counsel for Plaintiffs arrived at that number by performing various calculations on the numbers that are contained in the productivity reports.  But in the absence of evidence describing the productivity reports and how the data was collected and, more importantly, what that data means for purposes of the MCA exemption, the reports simply are not sufficient to establish as a matter of law that Plaintiffs fall outside the exemption.  Moreover, there is evidence in the record that Plaintiffs spend less than 90 percent of their time performing manual labor.  Plaintiff Angel Hernandez Nieves, for example, testified that he spent "80 to 85 percent" of his day working on a client's property and the remainder of his workday on issues relating to the truck and trailer.  It may be, then, that Plaintiffs spend as much as 20 percent of their time engaged in activities that, depending on the evidence at trial, are safety-affecting activities.  Even Plaintiffs do not suggest that this amount is de minimis.  In sum, the record does not establish as a matter of law that Plaintiffs spend more than 90 percent of their working time performing non-exempt work and does not establish as a matter of law that whatever exempt work they did perform was de minimis.  Plaintiffs' motion for summary judgment on the application of the MCA exemption is denied.[64]

---

[63] Plaintiffs refer to these so-called productivity reports as Exhibit 10.  They are in the summary judgment record as Doc. 304-3.

[64] The only other grounds for summary judgment asserted by Plaintiffs on the MCA exemption is that Defendants have wholly failed to keep adequate records tracking which Plaintiffs rode on which vehicles on which days; the amount of time each Plaintiff spent engaged in exempt activities on each day or week; and whether and when a specific vehicle traveled interstate. According to Plaintiffs, Defendants cannot establish the exemption without this evidence. Because Plaintiffs fail to provide the Court with any legal authority suggesting that this level of detail is required, and because the argument is premised on a heightened burden of proof that is not the law, the Court rejects these arguments at this juncture.  See *supra* note 28.

Having analyzed the parties' cross-motions for summary judgment on the issue of how much time must be spent by Plaintiffs on safety-affecting activities, the Court returns to the balance of Defendants' motion with respect to the MCA exemption, which is aimed at showing that all Plaintiffs meet one or more of the classes of employees covered by the exemption.  As will be explained, Defendants have not shown the absence of material disputed facts on whether Plaintiffs fit these classes of employees.  The Court, then, would deny summary judgment even if Defendants had persuaded the Court that the exemption applies to employees who spend minimal time on safety-affecting activities.

1.    Drivers

Defendants assert that Plaintiffs employed as foremen-laborers drive vehicles every working day and regularly cross state lines or could be called upon to do so. Based solely on this fact, Defendants urge that these foremen-laborers are exempt as "drivers," relying again on *Morris* as well as the DOT regulation defining a "driver" as including an employee who drives in interstate commerce "as part of a job in which they are required also to engage in other types of driving or nondriving work."[65]  The examples set forth in the regulation about "nondriving work," however, are not similar to the facts presented here.  The regulation describes "nondriving" work such as individuals who ride on motor vehicles and act as assistants or relief drivers; individuals who help with loading and unloading; so-called "driver-salesmen"; and drivers of chartered buses who have "many duties unrelated to driving."  By way of contrast, the regulation cites a state court case which held "that the exemption did not apply to a refrigeration mechanic by reason solely of the fact that he crossed States lines in a truck in which he

---

[65] 29 C.F.R. § 782.3(a).

transported himself to and from the various places at which he serviced equipment belonging to his employer."[66]  The regulation also cautions that "an employee of a carrier who drives a motor vehicle" is not "exempted as a 'driver' by virtue of that fact alone."[67]

Because Defendants have failed to provide any analysis connecting the specific facts of this case to the regulations and an accurate reading of pertinent case law, the Court cannot find as a matter of law that Defendants are entitled to apply the MCA exemption to those Plaintiffs who drove trucks, even on a daily basis, in connection with their work as foremen-laborers.

2.    Driver's Helpers

A "driver's helper" for purposes of the exemption requirement is an employee who is "required to ride on a motor vehicle" when it is being operated in interstate commerce.[68]  This classification includes employees such as armed guards on armored trucks and employees who "dismount when the vehicle approaches a railroad crossing and flag the driver across the tracks."[69]  The exemption applies only to employees who are required as part of the job to ride on a motor vehicle and not to those employees who ride in the vehicle not as a matter of fixed duty but as a convenient way to get to a job site.[70]  Similarly, the exemption does not apply to employees who ride in the vehicle but do not perform activities which affect the safety of the vehicle in interstate commerce.[71]  And it does not apply to employees who ride in the vehicle and "act as assistants."[72]

---

[66] *Id.* (citing *Colbeck v. Dairyland Creamery Co.*, 17 N.W.2d 262 (S.D. 1945)).

[67] *Id.* § 782.3(b).

[68] 29 C.F.R. § 782.4(a).

[69] *Id.*

[70] *Id.* § 782.4(c).

[71] *Id.*

[72] *Id.* § 782.4(a).

In their motion, Defendants assert that landscape laborers riding in Defendants' trucks often "take calls for drivers, help drivers park, and place orange safety cones or triangles around the trucks and trailers" and, accordingly, qualify as "driver's helpers" under the MCA exemption. Defendants' evidence falls far short of establishing the applicability of the exemption as a matter of law. Defendants have no evidence that landscape laborers performed activities similar to those described in the pertinent regulations and have not shown, as a matter of law, that any Plaintiffs who were riding in vehicles were required to ride in the vehicle as part of the job or performed activities which affected the safety of the vehicle "in interstate commerce."[73] In fact, there is evidence in the record from which a jury could reasonably conclude that Defendants did not require anyone to ride with a driver. Plaintiff Angel Torres-Cotto, for example, testified that he drives a truck every day in his job as a crew foreman and that he places orange cones around the trailer himself when he is alone, but that a crew member will do that task when Mr. Torres-Cotto is accompanied by a crew member. Defendants have not shown an entitlement to summary judgment on this issue.

3.     Loaders

According to the DOT regulations implementing the MCA exemption, a "loader" engages in work directly affecting the safety of operation of motor vehicles on public highways "so long as he has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balances load or in placing, distributing, or

---

[73] Defendants contend that loaders who do not exercise judgment and discretion necessarily qualify as "driver's helpers" under the regulations. But the regulations do not state that a loader who does not exercise judgment and discretion, without more, qualifies as a driver's helper. Rather, the regulations state that a loader who does not exercise judgment and discretion may qualify as a driver's helper if that employee otherwise qualifies as a driver's helper. *See* 29 C.F.R. 782.4(a).

securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized."[74]  While the evidence supports the conclusion that all Plaintiffs helped load Defendants' trucks and trailers, there is no evidence that Plaintiffs exercise independent judgment or discretion when doing so.  In fact, Defendants have not set forth any factual statements even suggesting that Plaintiffs exercised judgment or discretion in connection with the loading of trucks and trailers.  Rather, Defendants argue that "to the extent" that Plaintiffs are following instructions regarding how to load equipment or are simply placing equipment in pre-determined holders, Plaintiffs must still qualify as "loaders" for purposes of the regulation because they must still secure them and ensure that the holders are in good condition.

But this is not an accurate statement of the law or an accurate statement of the record.  As the regulations highlight, an employee who is merely providing physical assistance with loading while someone else provides direction is not exempt as a "loader."[75]  Defendants rely on the Tenth Circuit's case in *Shultz v. Kelley*,[76] but that case does not advance Defendants' argument.  In *Shultz*, the employee's duties involved loading hogs onto trucks in pre-determined compartments and to ensure that the doors of those compartments were securely closed.[77]  The DOL as plaintiff in that case argued that the employee did not exercise judgment and discretion in loading the hogs.[78]  The Circuit noted that the question of whether the employee was a "loader" was a "close one" and declined to decide it.[79]  The Circuit, however, emphasized that

---

[74] 29 C.F.R. § 782.5(a).

[75] 29 C.F.R. § 782.5(c).

[76] 431 F.2d 1364 (10th Cir. 1970).

[77] *Id.* at 1365-66.

[78] *Id.* at 1368-69.

[79] *Id.* at 1369.

the evidence at trial (the case arose after a full trial before the lower court) showed that the employee was "primarily responsible" for keeping the compartment gates and fasteners in proper repair and that it was his responsibility to report any damage so that trucks would not be permitted on the highways until repairs had been made by the employee.[80]  Defendants have directed the Court to no evidence that any Plaintiffs engaged in loading activities were primarily responsible for identifying damage and/or making repairs to trucks or trailers.[81]  Quite clearly, Defendants have not established as a matter of law that Plaintiffs are exempt from overtime pay as "loaders" under the MCA exemption.[82]

4.    Mechanics

Defendants asserts that "Epic's mechanics regularly inspect, maintain, and repair Epic's trucks and trailers."  This is the extent of Defendants' argument in support of their motion that their mechanics, as a matter of law, are exempt under the MCA exemption.  In their Statement of Facts, Defendants point to limited evidence that they maintain a separate mechanic shop and that mechanics perform tasks such as changing belts and replacing engines.  In fact, the evidence suggests that these mechanics are not performing laborer duties at all but work in the mechanic shop and that they have job titles such as "diesel mechanic" which appears distinct from the "lawn and landscape workers" and "hourly laborers" who make up the FLSA collective and the

---

[80] *Id.*

[81] While there is evidence that Plaintiffs reported problems when a problem was identified during loading activities, the evidence does not demonstrate as a matter of law that Plaintiffs were "primarily responsible" for identifying and resolving problems.

[82] Moreover, the Circuit in *Shultz* stated that an employee is a "loader" under the regulations if that employee "engages for a substantial part of his working time in the proper loading of his employer's motor vehicles." 431 F.2d at 1368.  This, of course, is consistent with the Supreme Court's decision in *Levinson v. Spector Motor Serv.*, 330 U.S.649 (1947).  Defendants have not shown or suggested that any Plaintiffs spent a substantial part of their working time loading Defendants' vehicles.

MMWL class respectively.  In other words, Defendants have not demonstrated at this juncture that the MCA exemption for "mechanics" applies to any member of the FLSA collective and/or MMWL class. The Court denies summary judgment on this issue.[83]

B.     *Agricultural Exemption*

In addition to their reliance on the Motor Carrier Act exemption, Defendants assert that Plaintiffs employed in Defendants' nursery are exempt from overtime pay by virtue of the agricultural exemption.[84]  The FLSA defines "agriculture" as including:

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . ., the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.[85]

Courts analyzing this definition have agreed that it covers two types of agricultural activities, which courts have labeled as "primary agriculture" and "secondary agriculture."[86] Primary agriculture refers to activities ranging from "farming in all of its branches," to "the raising of livestock, bees, fur-bearing animals, or poultry."[87] Secondary agriculture is broader and includes "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to

---

[83] To the extent that these "mechanics" spend most of the time working as landscape laborers, Defendants will need to establish that the amount of time these Plaintiffs spend on tasks associated with the "mechanics" position is sufficient to satisfy the exemption requirement.

[84] 29 U.S.C. § 213(b)(12).

[85] *Id.* § 203(f).

[86] *See Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 300 (1977).

[87] 29 U.S.C. § 203(f).

carriers for transportation to market."[88]  The agricultural exemption was meant to apply broadly and to "embrace the whole field of agriculture," but "it was meant to apply only to agriculture;" thus the critical issue is what is and what is not included within that term.[89]  To aid courts in analyzing that issue, the DOL has promulgated numerous provisions interpreting the agricultural exemption.  The Seventh Circuit has described these regulations as "nuanced" and "fact-intensive."[90]

Both parties have moved for summary judgment on the issue of whether Plaintiffs are exempt under the agricultural exemption.  Despite the fact that Defendants bear the burden of proving that the exemption applies,[91] and despite the fact that the regulations are both nuanced and fact-intensive, Defendants set forth a single statement of fact in support of their motion for summary judgment.[92]   That statement asserts that "Nursery workers . . . took care of plants in the nursery, including watering them, fertilizing them, pruning them, and putting mulch on them."  Defendants cite to a single DOL regulation (and ignore all the rest) suggesting that the exemption applies to nursery workers when those workers are "sowing seeds and otherwise propagating fruit, nut, shade, vegetable, and ornamental plants or trees, shrubs, vines, and flowers" or "planting, cultivating, water, spraying, fertilizing, pruning, bracing, and feeding the growing crop."[93]  But there is no evidence whatsoever that Plaintiffs were sowing seeds or propagating plants, trees, flowers or the like.  While there is evidence that some Plaintiffs spent

---

[88] *Id.*

[89] *Rodriguez v. Whiting Farms, Inc*., 360 F.3d 1180, 1185 (10th Cir. 2004) (citing *Maneja v. Waialua Agric. Co.*, 349 U.S. 254, 260 (1955)).

[90] *Luna Vanegas v. Signet Builders, Inc*., 46 F.4th 636, 642 (7th Cir. 2022).

[91] *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 48 (2025) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–197 (1974)).

[92] Doc. 299, ¶ 74.

[93] 29 C.F.R. § 780.205(a).

time watering, fertilizing and pruning trees, there is no evidence that this work was done on a "growing crop." The record is devoid of evidence concerning whether Defendants was growing its own plants and trees or whether they were purchasing plants and trees from other growers without doing significant agricultural work.[94] There is no evidence from which the Court might determine if Defendants' nursery operations were such that Defendants could be construed as a "farmer" for purposes of the exemption.[95] Without question, Defendants' motion for summary judgment must be denied.[96]

The Court turns, then, to Plaintiffs' motion for summary judgment. Like Defendants, Plaintiffs have given short shrift to their assessment of the agricultural exemption. Nonetheless, the Court finds that Plaintiffs have sufficiently pointed out the deficiencies in Defendants' evidentiary showing regarding the exemption to place the burden on Defendants to demonstrate the existence of a genuine dispute. Specifically, Plaintiffs assert in their motion that Plaintiffs are not engaged in agricultural work, that Defendants do not hire agricultural employees, that Defendants do not track the activities of Plaintiffs, and that Defendants simply cannot establish the exemption. As a result, it became Defendants burden to provide evidence from which a jury could find that the exemption applies.[97] They have wholly failed to do so. The Court grants

---

[94] *See Adkins v. Mid–American Growers, Inc.*, 167 F.3d 355, 357 (7th Cir.1999) ("When Mid–American buys plants and then resells them without doing significant agricultural work it is operating as a wholesaler rather than as a grower, and wholesalers of agricultural commodities are not exempt from the Act.").

[95] *See Luna Vanegas*, 46 F.4th at 645 (work falls within the FLSA secondary agricultural exemption only if, among other things, it is "performed by a farmer or on a farm") (citing 29 C.F.R. § 780.144)).

[96] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (where the moving party bears the burden of proof at trial, summary judgment on such an issue is only available when the party has made a showing "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party").

[97] *Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 941-42 (10th Cir. 2022) (summary judgment is the "put up or shut up" moment in a lawsuit; appellants failed to put up any evidence in support of their exemption defense after the SEC had demonstrated that "there is an absence of evidence to support the non-movant's case.")

Plaintiffs' motion to the extent it seeks summary judgment on Defendants' agricultural exemption defense.

C.    *Individual Liability/Employer Status of Defendants John Constant and Marty Siler*

The Fair Labor Standards Act ("FLSA") defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."[98]  The Tenth Circuit has permitted FLSA suits for individual liability and recently affirmed a district court's use of a four-factor "economic reality" test to determine whether an individual is an "employer."[99]  This "economic reality" test requires a district court to determine "whether the alleged individual [i] has the power to hire and fire employees; [ii] supervises and controls employee work schedules or conditions of employment; [iii] determines the rate and method of payment; and [iv] maintains employment records.[100]  The question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations.[101]

Utilizing this four-factor test, Defendants John Constant and Marty Siler move for summary judgment on Plaintiffs' FLSA claims to the extent those claims are asserted against

---

[98] *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Oklahoma Bd. of Regents*, 125 F.4th 1321, 1341 (10th Cir. 2025) (quoting 29 U.S.C.§ 203(d)).

[99] *Id*. at 1332, 1341. *Walkingstick Dixon* is an FMLA case; nonetheless, the Circuit relies on its prior FLSA decisions to find that individual liability under the FMLA is determined employer status under the FMLA.  *Id*. at 1342 (citing *Graziadio cv. Culinary Institute of Am*., 817 F.3d 415, 422 (2d Cir. 2016)) (setting forth same four-factor economic reality test to determine employer status).

[100] *Id*.

[101] *Quintanilla v. Suffolk Paving Corp*., CV-09-5331-AKT, 2019 WL 885933, at *14 (E.D.N.Y. 2019) (utilizing same four-factor economic reality test).

these Defendants individually.[102]  According to Defendants, there are no genuine issues of material facts as to whether John Constant and Marty Siler are employers for purposes of the FLSA.[103]  Plaintiffs, in turn, also move for summary judgment on the employer issue arguing that the undisputed facts require the conclusion that both individuals are employers under the FLSA.[104]  Both parties have submitted minimal evidence bearing on the four factors in the economic reality test.  Defendants urge that Messrs. Constant and Siler do not participate in hiring and firing decisions; do not set work schedules; and do not maintain employment records. Defendants also argue that Don Chapman was the individual who was responsible for analyzing overtime pay and exemption requirements.  Plaintiffs focus primarily on the ownership status of Messrs. Constant and Siler and that these individuals had the authority to hire and fire employees even if they seldom exercised that authority.

Neither side has established that it is entitled to summary judgment on the employer issue.  In the particular context of this case, the Court believes that the most significant evidence regarding the employer issue is whether and to what extent Mr. Constant and/or Mr. Siler made the decision to classify landscape laborers as exempt and whether and to what extent these individuals were involved in reviewing or reassessing that classification decision over the

---

[102] Defendant Epic Landscape Productions, Inc. also moves for summary judgment on the issue of its status as an employer.  Plaintiffs have not responded to this argument and, accordingly, this aspect of the motion is granted as unopposed.

[103] Defendants also move for summary judgment on individual liability under the MMWL, arguing that the economic reality test for determining employer status is the same under Missouri law.  Plaintiffs have not responded to this argument.  But because the Court denies Defendants' motion with respect to the employer issue under the FLSA, it must also deny the motion with respect to that issue under the MMWL.

[104] In their motion, Plaintiffs direct the Court to a different economic reality test—one that, according to Plaintiffs, is used "in deciding whether an individual is an employee or an independent contractor under the FLSA." Because that issue is not pertinent to this case, the Court utilizes the four-part test utilized by the lower court and affirmed by the Circuit in *Walkingstick Dixon*.

years.[105]  Mr. Siler testified he had numerous conversations over the years with Mr. Chapman about whether to pay overtime to landscape laborers and that Mr. Chapman advised Mr. Siler with regard to whether to pay overtime to landscape laborers.  This evidence, then, suggests that Mr. Siler was intimately involved in the decision that is at the heart of this case.  Similarly, Mr. Constant's deposition testimony, taken as a whole, is sufficient to permit a jury to conclude that Mr. Constant was a key decisionmaker with respect to the initial decision to classify landscape laborers as exempt under the FLSA and the decision to continue to deny overtime compensation to these workers over the years.  A reasonable jury, however, might also credit Defendants' evidence that Don Chapman was responsible for the classification and overtime decisions with respect to landscape laborers and that Messrs. Constant and Siler deferred entirely to his judgment without independently participating in that decision.  The point is that a jury must resolve these factual issues.  Both motions for summary judgment are denied.

## D.     Liquidated Damages and the Statute of Limitations

Ordinarily, an employer who violates the FLSA is liable for both unpaid wages and an additional equal amount as liquidated damages.[106]  To avoid such damages, the employer must show "to the satisfaction of the court that the act or omission giving rise to such action was in

---

[105] *Lambert v. CCC Builders Group Inc.*, 22-CV-05605-HG, 2023 WL 9022791, at *3 (E.D.N.Y. Dec. 29, 2023) (individual liability under FLSA is focused on four-factor economic reality test with particular focus on the individual's "responsibility for making decisions about the conduct of the business that contributed to the violations of the Act"); *Eissa v. Ledvance LLC*, 626 F. Supp. 3d 209, 217 (D. Mass. 2022) (extent to which individual had personal responsibility for making decision that contributed to alleged FLSA violations carries significant weight in determining whether individual is an employer under the Act); *Roche v. S-3 Pump Serv., Inc.*, 154 F. Supp. 3d 441, 452 (W.D. Tex. 2016) (holding that CEO could be individually liable for FLSA violations where, among other things, CEO made the decision to characterize the plaintiffs as exempt); *Viveros v. VPP Group, LLC*, 12-CV-129-BBC, 2013 WL 12090093, at * (W.D. Wis. Feb. 12, 2013) (individual may be employer under FLSA if he or she was responsible in whole or in part for the alleged violation).

[106] 29 U.S.C. § 216(b).

good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."[107]  "The good faith requirement mandates that the employer have 'an honest intention to ascertain and follow the dictates of [the FLSA].'" [108]  The "reasonable grounds" requirement "imposes an objective standard by which to judge the employer's behavior."[109] If the court finds that the employer has met this burden, the court may, in its discretion, deny or reduce liquidated damages.[110]

Relatedly,[111] a two-year statute of limitations applies to an action for unpaid wages under the FLSA, except where an employer acts willfully, which extends the limitations period to three years.[112] The employee bears the burden of proving that the employer acted willfully.[113] For purposes of the statute of limitations, "willful" means "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by [the FLSA]."[114]

In their motion for summary judgment, Defendants seek a ruling from the Court that, as a matter of law, they acted in good faith and without willfulness with respect to the alleged FLSA

---

[107] 29 U.S.C. § 260.

[108] *Dep't of Labor v. City of Sapulpa*, 30 F.3d 1285, 1289 (10th Cir. 1994) (quoting *Renfro v. City of Emporia*, 948 F.2d 1529, 1540 (10th Cir. 1991)).

[109] *Id.* (citing *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982)).

[110] 29 U.S.C. § 260.

[111] Although the issues of "good faith" and "willfulness" differ in terms of effects and burdens, they are interrelated and are often analyzed together. *Smith v. Bigtop Bingo, Inc.*, 660 F. Supp. 3d 1290, 1304–05 (N.D. Fla. 2023) (citing *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d1150, 1165 (11th Cir. 2008)) (holding that for FLSA purposes, good faith and willfulness are "mutually exclusive"); *accord Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1137 (10th Cir. 2000) (the same facts that supported the district court's conclusion that the employer's failure to compensate plaintiffs for on-call time was reasonable and in good faith supported the district court's conclusion that the employer's violation of the FLSA was not willful).

[112] 29 U.S.C. § 255(a).

[113] *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

[114] *Id.* at 133.

violations at issue in this case. Plaintiffs seek summary judgment on an award of liquidated damages under the FLSA.

As other district courts have found, "where no FLSA violation has been conclusively established, consideration of whether an employer acted in good faith in making such violation is premature."[115] As stated above, Defendants' liability for the alleged FLSA violations has not yet been established. Consequently, the Court concludes that it would be premature at this stage to rule on Defendants' good faith defense to liquidated damages or the related issue of whether Defendants acted willfully with respect to the alleged violations. These issues, then, will be resolved at trial.

E.      *Miscellaneous Issues Relating to FLSA Claims*

Defendants move for summary judgment on the claims of all Named Plaintiffs who have failed to file Consents to Join, citing case law recognizing that even Named Plaintiffs must file separate written consents. Plaintiffs have responded only by highlighting that the Named Plaintiffs have sued in their individual capacities as well as on behalf of similarly situated individuals such that a separate written consent should not be required. The "question whether a named plaintiff, or plaintiffs, must file a separate written consent form in addition to indicating their desire to proceed collectively in the pleadings turns out to be a complex one."[116] It is a question that the Tenth Circuit has not decided and this Court declines to decide it at this juncture when the parties have barely briefed the pertinent issues. Clearly, Defendants have not

---

[115] *Midkiff v. Anthem Companies, Inc*., No. 3:22-CV-417–HEH, 2025 WL 992693, at *13 (E.D. Va. Apr. 2, 2025) (collecting cases).

[116] *Smith v. Pro. Transportation, Inc*., 5 F.4th 700, 703-4 (7th Cir. 2021) (describing Circuit split on the issue).

shown that they are entitled to summary judgment. Even assuming this Court decided that all Named Plaintiffs must file a separate written consent, Defendants argue only that these Plaintiffs did not file formal Consents to Join. But even the case that Defendants cite recognizes that "[c]ourts have generally taken a lenient approach in deciding what sort of written notice is sufficient."[117] Defendants have not shown the absence of sufficient written consent. Defendants' motion, then, is denied.

Similarly, Defendants move for summary judgment on the claims on three Plaintiffs who failed to sign their Consent to Join forms. Plaintiffs indicate in their response that these three Plaintiffs hand-printed their names on the Consents and that those printed names should be sufficient. Notably, the FLSA does not require a signature and Defendants have not otherwise challenged the integrity of the consents. They have not shown that they are entitled to summary judgment.[118]

Defendants next assert that any Plaintiffs who have received payment as a result of the *Albelo* settlement are barred from recovering damages in this case.[119] Plaintiffs indicate in their response that those Plaintiffs who received settlement money in *Albelo* have been dismissed

---

[117] *Coldwell v. RITECorp Env't Prop. Sols.*, No. 16-CV-01998-NYW, 2018 WL 5043904, at *4 (D. Colo. Oct. 17, 2018) (citing *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 282 (E.D.N.Y. 2013)) (holding that a written declaration made during discovery in which plaintiff obliquely referred to himself as a plaintiff in the action was sufficient); *D'Antuono v. C & G of Groton, Inc.*, No. 3:11-CV-33-MRK, 2012 WL 1188197, at *3 (D. Conn. 2012) (holding that an affidavit attached to the response to the motion to dismiss wherein Plaintiff referred to "this litigation" met the requirement); *Contrera v. Langer*, 290 F. Supp. 3d 269, 277 (S.D.N.Y. 2018) (holding that requirement was met by plaintiff's filing affidavit in motion to conditionally approve case as FLSA collective action in which plaintiff stated he was a plaintiff in the action); *Manning v. Gold Belt Falcon, LLC*, 817 F. Supp. 2d 451, 454 (D.N.J. 2011) (same).

[118] *See Brashier v. Quincy Prop., LLC*, No. 3:17-CV-3022, 2018 WL 1934069, at *7 (C.D. Ill. Apr. 24, 2018) (noting that most courts require a signature, electronic signature *or the person's hand-printed name*, but leaving for another day "whether a consent sent by text message without any signature or hand-placed mark constitutes a valid consent under § 216(b)" (emphasis added) (citations omitted)).

[119] The *Albelo* case was filed in the Western District of Missouri and involved FLSA and state law claims asserted by lawn and landscape workers employed by Epic Landscape Productions, L.C.—the only named defendant in that case. *See Albelo v. Epic Landscape Productions, LC*, No. 4:17-cv-0454-DGK, 2021 WL 2213305, at *2-3 (W.D. Mo. June 1, 2021).

from this lawsuit.  This issue, then, appears to be moot.  In any event, Defendants do not ask the

Court for any specific relief at this time so these issues can be fleshed out at a later date if

necessary.  Curiously, Defendants also assert that any Plaintiffs who could have participated in

the *Albelo* settlement but elected not to do so are also barred from recovering damages in this

case.  According to Defendants, those Plaintiffs who had notice of *Albelo* but decided not to opt-

in to that case "induced Defendants to believe that they did not intend to bring claims against

Defendants for allegedly unpaid overtime premiums by failing to join the *Albelo* lawsuit."

Defendants contend that they reasonably relied on this belief when deciding to settle *Albelo* and

that they might not have done so had they known that many more individuals would seek

overtime through a second lawsuit.  This argument is based solely on principles of equitable

estoppel and laches.  Defendants have directed the Court to no cases applying those doctrines in

this context[120] or any authority supporting the idea that an individual who declines to opt in to an

FLSA collective action is barred from participating in a subsequent suit.  The motion is denied

on this issue.

Defendants state in their motion that they reached a settlement with the DOL in

September 2022 regarding the payment of overtime to certain H-2B workers including,

according to Defendants, numerous Plaintiffs and class members for the period of November 2,

2017-November 1, 2019.  They assert that Plaintiffs are not entitled to damages "to the extent

they have already received them through the settlement with the DOL."  Plaintiffs, in response,

---

[120] In fact, the Tenth Circuit has rejected the general application of equitable estoppel in the FLSA context. *Mencia v. Allred*, 808 F.3d 463, 470 (10th Cir. 2015) ("[T]he use of equitable estoppel in FLSA wage claims is limited because such claims 'lie in an area where agreements and other acts that would normally have controlling legal significance are overcome by Congressional policy.'" (quoting *Caserta v. Home Lines Agency, Inc*., 273 F.2d 943, 946 (2d Cir.1959)); *see also Norris v. HBJ Corp*., No. 3:24-CV-50103, 2024 WL 3984478, at *1 (N.D. Ill. Aug. 29, 2024) (laches is inapplicable to claims that are covered by a statute of limitations; because the FLSA has a statute of limitations, a laches defense cannot apply to an FLSA claim).

assert that the DOL settlement does not cover the entire class period and/or does not cover all the overtime hours that Defendants failed to pay. Particularly because the Court is granting Defendants' motion for summary judgment on the contract claims, the parties should re-examine these issues together. If they cannot resolve this issue after meeting and conferring, Defendants may file a pre-trial motion.

Lastly, Defendants move to dismiss the claims of three Plaintiffs who, according to Defendants, ceased working for Defendants prior to February 1, 2017 and one Plaintiff who began working for Defendants after July 4, 2021, the date on which Defendants began paying overtime to landscape laborers. The FLSA collective certified by the Court is limited to landscape laborers who worked for Defendants at any time from April 28, 2020 through April 27, 2023. The MMWL class certified by the Court is limited to landscape laborers who worked for Defendants in Missouri from May 30, 2019 until July 4, 2021. By definition, then, anyone who ceased working for Defendants prior to February 1, 2017 is not a collective or class member. With respect to the one individual who began working for Defendants after July 4, 2021, that individual's employment falls within the time period of the FLSA collective time definition. Because it is unclear whether Plaintiffs are claiming that FLSA overtime violations occurred after July 4, 2021 despite the change in Defendants' compensation policy,[121] the record does not warrant dismissal at this juncture.

## IV. Plaintiffs' State Law Claims

In addition to their FLSA claims for unpaid overtime, Plaintiffs assert claims for unpaid overtime under the Missouri Minimum Wage Law ("MMWL")[122] and claims based on state

---

[121] In the pretrial order, Plaintiffs appear to concede that their FLSA overtime claims have an end date of July 4, 2021. Doc. 284, ¶ 4(a)(i).

[122] Mo. Rev. Stat. § 290.505.

contract law theories, alleging that Defendants promised to pay overtime in the H-2B visa applications Defendants submitted to the Department of Labor (DOL). Because the parties agree that Plaintiffs' MMWL claims mirror their FLSA claims in all pertinent respects,[123] the Court resolves the parties' motions with respect to the MMWL claims as it did with respect to the FLSA claims. That is, the Court grants summary judgment in favor of Defendants on the issue of whether Defendant Epic Landscape Productions, Inc. is an employer for purposes of the MMWL and grants summary judgment in favor of Plaintiffs on the applicability of the agricultural exemption to the MMWL. The motions are otherwise denied.

A.     *Breach of Contract Claims*

In the Pretrial Order, Plaintiffs assert that Defendants entered into contracts with the H-2B worker class by submitting H-2B visa applications to the Department of Labor (DOL), representing in those applications that overtime compensation would be paid at a rate of 1.5 times the normal rate for all hours in excess of forty hours, and accepting foreign employees pursuant to those applications. Both parties move for summary judgment as to Defendants' liability on these claims. In their motion, Plaintiffs ask the Court to conclude, as a matter of law, that Defendants formed a contract with their H-2B workers when they submitted their temporary labor certification applications and that Defendants then breached those contracts by failing to pay overtime as promised in the applications. Defendants, in turn, assert that summary judgment in their favor is required because Plaintiffs have not come forward with sufficient facts to demonstrate the existence of a contractual relationship between Defendants and their H-2B

---

[123] *Id*. § 290.505(4) ("Except as may be otherwise provided . . . this section shall be interpreted in accordance with the Fair Labor Standards Act[.]").

workers and, in any event, the undisputed facts demonstrate that any contractual relationship that did exist did not include a promise to pay overtime compensation.  As will be explained, the Court concludes as a matter of law that Defendants had a contractual relationship with their H-2B workers under Kansas law. [124]  But because the Court also finds that Plaintiffs have not shown any facts from which a reasonable jury could conclude that the terms of that relationship included a promise to pay overtime compensation, the Court grants summary judgment in favor of Defendants on Plaintiffs' breach of contract claims.

In support of their motion for summary judgment, Plaintiffs begin with the Eighth Circuit's decision in *Cuellar-Aguilar v. Deggeller Attractions, Inc*.[125]  In that case, a class of workers who were hired under the H-2B temporary labor certification program brought breach of contract claims against the defendant under Arkansas law based on the defendant's failure to pay those workers the prevailing wage.[126]  The workers alleged that the defendant, to obtain the certifications, promised the DOL that it would pay foreign workers it hired at least the prevailing wage applicable to the positions in which the workers were hired.[127]  In support of their breach of contract claims, the workers alleged that the defendant violated the wage term of their employment contracts by paying them less than the prevailing wage.[128]  The district court held that no contractual relationship existed and dismissed the claims.[129]  The district court's decision

---

[124] Plaintiffs assert in the pretrial order that Missouri law applies to their state law claims to the extent that some workers were working out of a location in Kansas City, Missouri for a time period but that Kansas law otherwise applies to their state law claims.  Defendants assert that only Kansas law applies to these claims.  Because Plaintiffs have not argued that Missouri law is different from Kansas law in any material respects, the Court analyzes Plaintiffs' claims under Kansas law.

[125] 812 F.3d 614, 619 (8th Cir. 2015).

[126] *Id*. at 617-18.

[127] *Id*. at 617.

[128] *Id*. at 617-18.

[129] *Id*. at 618.

was based on the fact that the federal regulations governing the H-2A visa program contained a specific provision that "in the absence of a written contract, the required terms of the job order and application . . . shall be the work contract" and the regulations governing the H-2B program lacked an analogous provision.[130]  From this regulatory framework, the district court concluded that the H-2B applications did not constitute an employment contract and, accordingly, the workers lacked a contractual relationship with the defendant.[131]

On appeal, the Eighth Circuit reversed the district court's dismissal of the breach of contract claims.[132]  In doing so, the Circuit began by looking at Arkansas law "rather than the pronouncements of federal agencies" and easily found the existence of a contract between the H-2B workers and the defendant.[133]  The contract, however, was not based on the applications filed by the defendant.  Rather, the workers sufficiently pled the existence of a contractual relationship under Arkansas law by alleging that they received offers to work for the defendant and that they accepted those offers by traveling to the United States to perform that offered work.[134]  As to the specific terms of that contractual relationship, the Circuit again looked to Arkansas law.[135]  Although the plaintiffs alleged only that the defendant promised the DOL that it would pay the prevailing wage (and did not allege that the defendant made that promise directly to them), the Circuit held that courts applying Arkansas law would import the prevailing wage requirement into the contractual relationship as a matter of law.[136]  Specifically, the Circuit explained that

---

[130] *Id.*

[131] *Id.*

[132] *Id.* at 618-20.

[133] *Id.* at 618.

[134] *Id.* at 619.

[135] *Id.*

[136] *Id.* at 618-19 & n.1. The Eighth Circuit expressly declined to decide whether the plaintiffs' allegations concerning defendant's promise to the DOL would be sufficient to support a reasonable inference that the defendant

Arkansas courts have recognized that the "law in effect at the time a contract is made forms a part of the contract as if it had been expressed in the contract."[137] Relying on this principle, the Circuit found that the H-2B regulations were part of the contract, including the federally mandated prevailing wage.[138] In other words, the defendant's obligation to pay the prevailing wage as set forth in the labor certification applications and the H-2B regulations constituted the law in effect at the time the contracts were made and that term formed a part of the workers' contracts.[139]

Plaintiffs urge the Court to follow the analysis and conclusion of *Cuellar-Aguilar*. As will be explained in detail, if the Court follows the analysis of the Eighth Circuit—which it finds not only persuasive but an accurate application of contract law—then the Court must grant summary judgment to Defendants. As the Eighth Circuit did in *Cuellar-Aguilar*, the Court here readily concludes as a matter of law that a contractual relationship existed between Defendants and the class of H-2B workers.[140] Under Kansas law, the "fundamental rule of employment contract formation is simple. Employment is offered and then employment is accepted. And a contract is born."[141] Defendants do not dispute that employment was offered and accepted in this case. The material dispute between the parties is what the terms of that contractual relationship were.[142]

---

offered the workers the prevailing wage in light of its conclusion that Arkansas law could import the prevailing wage into the contract as a matter of law. *Id.* at 619 n.1.

[137] *Id.* at 619 (citations omitted).

[138] *Id.* at 619-20.

[139] *Id.* at 620.

[140] *Benchmark Prop. Remodeling, LLC v. Grandmothers, Inc*., 553 P.3d 974, 981 (2024) ("When the evidence pertaining to the existence of a contract . . . is conflicting or permits more than one inference, a question of fact is presented. However, whether undisputed facts establish the existence . . . of a contract raises a question of law for the court's determination.") (citing *Nungesser v. Bryant*, 153 P.3d 1277 (2007)).

[141] *Henretty v. Healthcenter Nw., LLC*, 559 P.3d 1229, 1234 (Kan. Ct. App. 2024).

[142] Defendants urge in their submissions that no contractual relationship existed between the parties. But the thrust of Defendants' argument is that the terms set forth in the H-2B applications were not part of whatever contractual relationship did exist between the parties.

The Court turns, then, to the evidence in the record relating to the terms of the parties' contractual relationship.[143]  Plaintiffs have no evidence that Defendants made promises directly to them to pay overtime compensation.  Unlike the situation in some other cases described below, there is no evidence here of any written or verbal communications between Defendants and their H-2B workers about any specific terms or conditions of employment.  As stated by Plaintiffs in the pretrial order, Plaintiffs' breach of contract claims are based solely on Defendants' representations about overtime availability and overtime compensation contained in the materials submitted by Defendants to the DOL in support of their temporary labor certification applications. Plaintiffs, however, direct the Court to no cases applying Kansas law (or any law, for that matter) that support the conclusion that Defendants' representations to the DOL concerning overtime are sufficient to support a reasonable inference that a promise of overtime compensation is part of the employment contract with the H-2B workers.

This is the very question that the Eighth Circuit in *Cuellar-Aguilar* expressly declined to decide.[144]  The Circuit was able to avoid that issue based on its conclusion that Arkansas law would import the federal regulations governing the H-2B program into the parties' contract.  And because those regulations included the employer's obligation to pay the prevailing wage, the plaintiffs in that case could pursue breach-of-contract claims that were based on the employer's failure to pay the prevailing wage.  Under Kansas law, "all existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to the effect were

---

[143] *Benchmark Prop. Remodeling, LLC*, 553 P.3d at 981 ("When the evidence pertaining to the . . . content of [a contract's] terms is conflicting or permits more than one inference, a question of fact is presented. However, whether undisputed facts establish the . . . terms of a contract raises a question of law for the court's determination.") (citing *Nungesser*, 153 P.3d 1277).

[144] *See supra* note 136.

inserted therein."[145]  Thus, the Court here, like the Eighth Circuit in *Cuellar-Aguilar*, can import the H-2B federal regulations into the terms of the contractual relationship between the H-2B workers and Defendants.  However, Plaintiffs have not identified any provision contained in those regulations that obligates Defendants to pay overtime to Plaintiffs.[146]

The Court, on its own, has identified certain provisions in the H-2B regulations that bear on the issue of Defendants' obligations with respect to overtime compensation.[147]  First, the regulations require an employer to include in its job order whether overtime will be available and the wage offered for overtime,[148] and to provide a copy of that job order to its H-2B workers at the time the worker applies for the visa.[149]  The evidence in this case demonstrates that Defendants, in each job order, represented that overtime was available at 1.5 times the hourly rate of pay. There is no evidence, however, concerning whether Defendants ever disclosed the contents of the job order to its H-2B workers.  The Court need not opine on whether this regulation—and, more specifically, an employer's duty to disclose to its H-2B workers any terms of employment relating to overtime hours and wages—might support a breach of contract claim

---

[145] *Steele v. Latimer*, 521 P.2d 304 (1974).

[146] Although the DOL's interpretive guidance is not controlling, the Court notes that the DOL does not read the H-2B regulations as mandating overtime.  *See* U.S. Dep. of Labor, Wage and Hour Div., Field Assistance Bulletin No. 2021–3, *Overtime Obligations Pursuant to the H-2B Visa Program* (Dec. 7, 2021) ("The H-2B visa program does not mandate the payment of an overtime premium for hours worked exceeding a certain number in the day, week, or pay period.  However, employers participating in the H-2B visa program are required by the FLSA to pay an overtime premium of not less than one and one-half times the workers' regular rate of pay for hours worked exceeding 40 hours in a workweek."). The DOL, however, does indicate that when overtime pay is required by law such as the FLSA, an employer must include the wage offer for working any overtime hours in the job order (as Defendants did in this case), which renders that wage offer enforceable as part of the H-2B visa program.  But whether that wage offer is enforceable by the DOL as part of the H-2B visa program is a separate inquiry from whether an H-2B worker may bring a claim for breach of contract based on an employer's failure to pay an overtime premium.

[147] The regulations discussed herein have been in effect at all times since the start of the class period.

[148] 20 C.F.R. § 655.18(b)(6).

[149] *Id*. § 655.20(l).

in another case.  For purposes of this case, Plaintiffs have not asserted this specific contract theory and have never relied on this specific regulation.

Second, the H-2B regulations contain a provision that requires employers to "comply with all applicable Federal, State and local employment-related laws and regulations, including health and safety laws."[150] Presumably, this provision requires Defendants to comply with the FLSA, including its requirements relating to overtime compensation. But any breach-of-contract claim premised on this regulation would require a showing that Defendants violated the FLSA. While the Court need not decide the issue because Plaintiffs have not relied on this regulation in support of their contract claims, the Court notes that the FLSA contains "an unusually elaborate enforcement scheme" that provides the exclusive remedy for enforcing the Act and would, in all likelihood, preempt any contract claims based on this specific provision.[151]

A review of additional cases relied upon by Plaintiffs illustrates the problem with the specific theory underlying Plaintiffs' breach of contract claims.  Plaintiffs, for example, contend that *Cailao v. Hotelmacher LLC*[152] is "directly on point."  In that case, a class of H-2B workers asserted breach of contract claims against their employer for failure to pay them the prevailing wage and failure to provide additional benefits as promised in their employment contracts.[153] Plaintiffs here suggest that the plaintiffs in *Cailao* based their contract claims, like Plaintiffs in this case, solely on the documents submitted by the employer during the H-2B application process.  But a careful reading of *Cailao* reveals that the allegations before the court on the defendants' Rule 12(b)(6) motion were markedly different from the facts presented here—and in

---

[150] *Id*. § 655.20(z).

[151] *See Blair v. TransAm Trucking, Inc*., 309 F. Supp. 3d 977, 996 (D. Kan. 2018) (citing *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 193 (4th Cir. 2007)).

[152] No. CIV-17-800-SLP, 2019 WL 13159739 (W.D. Okla. Feb. 5, 2019).

[153] *Id*. at *1.

significant ways.  As the court explained in *Cailao*, the H-2B workers did not base their contract claims solely on the documents submitted by the defendants during the H-2B visa application process.[154]  Rather, the plaintiffs' claims were based on the legal obligations imposed by the H-2B regulations, plus written and verbal communications made directly to each plaintiff, including a written offer letter that was provided to each plaintiff.[155]   Plaintiffs have not identified any facts in this case concerning overtime representations or promises beyond the applications submitted by Defendants to the DOL. And while the court in *Cailao* imported the obligations found in the H-2B regulations into the terms of the parties' contracts, those obligations related directly to the plaintiffs' claims for the prevailing wage and certain fee payments.  As pertinent here, the court in *Cailao* did not find that the H-2B regulations imposed any legal obligation to pay overtime. Contrary to Plaintiffs' argument, then, nothing in *Cailao* supports the conclusion that Plaintiffs' contractual relationship with Defendants includes terms relating to the payment of overtime.

Another case relied upon by Plaintiffs reinforces this point.  In *Moodie v. Kiawah Island Inn Co*., a class of H-2B workers brought breach of contract claims against the defendant for failure to pay the prevailing wage and certain pre-employment expenses.[156]  The defendant moved to dismiss those claims, asserting that the temporary labor certifications and H-2B regulations did not constitute a contract between the plaintiffs and defendant.[157]  The court easily found that a contract existed under South Carolina law by virtue of the fact that the employer offered to hire the plaintiffs and the plaintiffs traveled to South Carolina and performed

---

[154] *Id.* at *7.

[155] *Id.* at *2-3, 7.

[156] 124 F. Supp. 3d 711 (D.S.C. 2015).

[157] *Id.* at 725.

services.[158]  In determining the terms of that contract, however, the court explained that the plaintiffs could not rely on the defendant's promises to the DOL in its applications for temporary labor certifications that it would pay the plaintiffs the prevailing wage.[159]  In fact, the court granted defendant's motion to dismiss on that point:

> In such employment contracts, the terms of the contract are the promises made by the employer; the individual accepts those terms by beginning work. Here, Plaintiffs have not alleged that Defendant promised to pay them the prevailing wage. They only allege that Defendant made promises *to the DOL* that it would pay the prevailing wage. The terms of the employment contract consist of what Defendant promised Plaintiffs, not what it promised a third party. Therefore, to the extent that Plaintiff relies on promises made to the DOL, Defendant's motion is granted.[160]

*Moodie*, then, supports the conclusion that the Court may not import terms solely from the Defendants' temporary labor certification applications into the parties' contracts.  Nonetheless, the plaintiffs' breach of contract claims in *Moodie* survived dismissal because the plaintiffs relied not on the defendant's promises to DOL but on the regulations themselves.[161]  The court, then, imported those regulations consistent with South Carolina law and found that the regulations were part of the parties' contract.[162]  And because those regulations required the payment of the prevailing wage and the payment of certain fees that plaintiffs were seeking to

---

[158] *Id*. at 725-26.

[159] *Id*. at 726.

[160] *Id*. (emphasis in original) (citations omitted).  The *Moodie* court assumed, without deciding, that the employer's applications and the DOL's issuance of temporary labor certifications constituted a contract between the employer and the DOL.  *See id*. at 728 n.14. The court nonetheless dismissed the H-2B workers' alternative third-party beneficiary claim under *Astra USA, Inc. v. Santa Clara Cnty*., 563 U.S. 110 (2011).  *Id*. at 728 (third-party beneficiary cannot sue to enforce government contract when the statute giving rise to the contract provides no private right of action and the government contracts simply incorporate statutory obligations and record a company's agreement to abide by them).

[161] *Id*. at 726 ("In addition to relying on Defendant's promises to DOL, Plaintiff argues that the H-2B regulations were the law at the time the contract was created, and, therefore, constitute terms of the employment contract.").

[162] *Id*.

recover, the court held that the plaintiffs had stated a claim for breach of contract under state law.[163]

While most of the cases relied upon by Plaintiffs concern breach of contract claims based on an employer's failure to pay the prevailing wage,[164] one case relied on state law and the H-2B regulations to import not just the prevailing wage requirement but the specific term of employment promised to the H-2B workers.  In *Jimenez v. GLK Foods LLC*,[165] a class of H-2B workers filed, among other claims, state law claims for breach of contract against their employer for failing to pay the prevailing page and for failing to employ the workers for the promised term of employment.[166]  It was undisputed that the employer had not provided the H-2B workers with any written disclosures of terms of employment or with written employment contracts.[167]  The employer indicated in each of two temporary labor certification applications that it intended to employ its workers for a period of roughly 15 weeks.[168]  Each application was certified by the DOL for a "validity period" corresponding to this time period.[169]  The employer decided to

---

[163] *Id.*

[164] *See, e.g.*, *Zamalloa v. Thompson Landscape Servs., Inc.*, No. 4:1-7CV-00519-ALM-KPJ, 2018 WL 3032677, at *5 (E.D. Tex. May 3, 2018) (H-2B regulations imposed legal obligation on employer to pay its H-2B workers no less than the prevailing wage); *Aviles-Cervantes v. Outside Limited, Inc.*, 276 F. Supp. 3d 480, 494-95 (D. Md. 2017) (denying motion to dismiss breach of contract claims based on failure to pay prevailing wage to H-2B workers where plaintiffs alleged they entered into work contracts that explicitly or by operation of law offered the terms and conditions set forth in temporary labor certification applications); *Cordova v. R & A Oysters, Inc.*, 169 F. Supp. 3d 1288, 1291 (S.D. Ala. 2016) (denying motion for judgment on the pleadings with respect to breach of contract claims based on failure to pay prevailing wage where plaintiffs alleged that H-2B applications, certifications and regulatory requirements created an offer of employment, which they accepted by traveling to the United States and performing services); *Teoba v. TruGreen Landcare LLC*, No. 10-CV-6132 CJS JWF, 2013 WL 1560208, at *4 (W.D.N.Y. Apr. 20, 2013) (denying motion to dismiss breach of contract claim by H-2B workers where workers alleged that defendant, as part of the recruiting process, offered workers employment contracts containing, either explicitly or by operation of law, the requirement of federal law that Defendant pay prevailing wage).

[165] No. 12-CV-209, 2016 WL 2997498, at *11 (E.D. Wis. May 23, 2016).

[166] *Id.* at *1-2.

[167] *Id.* at *3.

[168] *Id.* at *4.

[169] *Id.*

terminate its H-2B workers after eight weeks or less (some workers were terminated before they even left Mexico) and did not compensate the H-2B workers for any portion of the "validity period" that they did not work.[170]

The parties in *Jiminez* cross-moved for summary judgment on the plaintiffs' claims that the employer failed to employ them for the promised term of their employment in violation of state contract law.[171]  The employer denied that it was legally obligated to employ the workers for the entire duration of the "validity period" certified by the DOL, arguing that the workers were at-will employees under Wisconsin law such that terminating their employment at any time was not unlawful and that the H-2B applications did not create a contract guaranteeing employment for the entire certified period of employment.[172]  The district court granted the plaintiffs' motion.  In doing so, the court first found that employment under the H-2B program is not at will, based on a provision in the H-2B regulations in effect at that time that stated "[e]mployees may be terminated for cause."[173] According to the court, that statement implied that H-2B workers could not be terminated absent cause and, accordingly, that they were not at-will employees.[174]  And because the employer had not disclosed to the plaintiffs any specific term of employment, the court looked to Wisconsin law to fill in that gap, concluding that the parties intended for the contract to run for a reasonable period of time.[175]  The court concluded,

---

[170] *Id*. at *4-5.

[171] *Id*. at *5, *10.

[172] *Id*. at *10.

[173] *Id*. at *11 (citing 20 C.F.R. § 655.22(f)).

[174] *Id*.

[175] *Id*. at 12 (citing *Amoco Oil Co. v. Capitol Indem. Corp*., 95 Wis. 2d 530, 551, 291 N.W. 2d 883 (Ct. App. 1980) (citing the general rule that "where a contract fails to specify a time of duration, it may be inferred that the parties thereto intended the contract to run for a reasonable time" and what constitutes a "reasonable time" is usually implied from facts "derivable from language used by parties considered in context of subject matter and attendant circumstances, in aid of apparent intention").

then, that using the end date of the certification period as the term of the agreements was reasonable.[176]

    *Jiminez*, then, is persuasive because it examined an issue other than the prevailing wage requirement and yet still looked to state law and the H-2B regulations to ascertain the specific terms of the parties' employment relationship.  In that case, it was not enough that the employer had identified in its applications an intended period of employment or that the DOL had certified that period of employment as the "validity" period.  *Jiminez* supports this Court's conclusion that Plaintiffs, in the absence of any other evidence that their contractual relationship with Defendants includes terms relating to the payment of overtime, must demonstrate that the H-2B regulations imposed a legal obligation on Defendants to pay overtime.  They have not done so.

    In addition to the H-2B cases cited by Plaintiffs in their submissions, Plaintiffs direct the court to numerous cases involving the H2-A visa program in which courts have found viable breach of contract claims based on terms found in "job clearance orders" or "job orders."[177] Significantly, the federal regulations governing the H–2A program provide that "[i]n the absence of a separate written work contract incorporating the required terms and conditions of employment, agreed to by both the employer and the worker, the work contract at a minimum will be the terms and conditions of the job order."[178] No similar provision exists under the H–2B

---

[176] *Id.*

[177] *See, e.g., Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1324 (S.D. Ga. July 31, 2019).

[178] 20 C.F.R. § 655.103(b) (defining an H–2A work contract).

regulations.[179] Plaintiffs, citing the Eighth Circuit's decision in *Cuellar-Aguilar*,[180] contend that this distinction is one without a difference such that H-2A cases apply with full force in the H-2B context. This is simply not accurate. In *Cuellar-Aguilar*, the Eighth Circuit did not suggest that the differences between the H-2A and H-2B regulations was meaningless. Rather, the Circuit explained that the district court could not conclude that the H-2B applications did not constitute contracts based solely on the fact that the H-2B regulations did not contain a provision analogous to the H-2A provision defining the job order as a work contract.[181] According to the Eighth Circuit, the district court was required to look to state law to determine whether a contract existed, not to "the pronouncement of federal agencies."[182] Thus, in cases involving H-2A workers, courts are not required to engage in an extensive contract analysis because the job order completed by the employer, as defined in the applicable federal regulation, is a contract between the employer and the worker. Conversely, in cases involving H-2B workers, courts are required to look to state law to ascertain whether a contract between the employer and worker exists and, if so, what the specific terms of that contract are. The H-2A cases cited by Plaintiffs, then, are not helpful to the Court's analysis of the issues here.[183]

---

[179] *See* 20 C.F.R. § 655.5 (providing definitions of H–2B–related terms). In *Rueda v. A. Olivarez Harvesting, LLC*, No. 5:18-cv-01325-OLG, 2019 WL 7905730, at *4 (W.D. Tex. June 28, 2019), the court stated in dicta and without elaboration that an "employer's certifications to the DOL for both H-2A and H-2B visas are incorporated into the terms of the employment contracts." In support of its statement concerning the H-2B certifications, the *Rueda* court cited only to *Zamalloa v. Thompson Landscape Servs., Inc*., No. 4:1-7CV-00519-ALM-KPJ 2018 WL 3032677, at *5 (E.D. Tex. May 3, 2018), for the principle that the court in *Zamalloa* permitted the "enforcement of H-2B labor certification terms under state contract law." But *Zamalloa* clearly relied not only on the certifications but on the H-2B regulations that imposed a legal obligation upon the employer to pay its H-2B employees no less than the prevailing wage. *See id*.

[180] 812 F.3d 614 (2015).

[181] *Id*. at 618.

[182] *Id*.

[183] *See Bojorquez-Moreno v. Shores & Ruark Seafood Co*., 92 F. Supp. 3d 459 (E.D. Va. 2015) (citations to H-2A cases are "generally unhelpful" in the context of H-2B breach-of-contract cases because the H-2A regulations provide that the terms of the job order and the application constitute the work contract).

In summary, while the Court finds that a contractual relationship existed between Defendants and their H-2B workers, Plaintiffs have not come forward with sufficient facts from which a reasonable jury might infer that overtime compensation was a term of that contractual relationship. Plaintiffs have not directed the Court to any case finding that H-2B workers have a contractual right to overtime compensation based on an employer's temporary labor certification applications or the regulations implementing the H-2B program. For all of the foregoing reasons, the Court grants summary judgment in favor of Defendants on Plaintiffs' breach of contract claims.

B.     *Third Party Beneficiary/Unjust Enrichment Claims*

Finally, the Court turns to the state law claims of the citizen-worker class. Based on federal regulations requiring Defendants to pay citizen workers the same wages as are paid to H-2B workers, the citizen-worker class asserts that they are third-party beneficiaries of Defendants' contracts with the H-2B workers and that they are entitled to overtime compensation by virtue of those contracts. As an alternative to their third-party beneficiary claims, the citizen-worker class asserts claims of unjust enrichment.

Summary judgment in favor of Defendants is required on these claims. Plaintiffs have acknowledged in the pretrial order that Defendants' liability on Plaintiffs' third-party beneficiary claims and their alternative unjust enrichment claims necessarily hinges on the existence of a valid contract for overtime compensation between Defendants and the H-2B workers.[184] Because the Court has held that the H-2B workers have not shown a contractual right to overtime

---

[184] *See* Doc. 284, ¶ 4(a)(iv)-(v).

compensation and that Defendants are entitled to summary judgment on the H-2B workers' breach-of-contract claims, summary judgment is necessarily required on the remaining claims.[185]

IT IS THEREFORE ORDERED BY THE COURT THAT **D**efendants' motion for summary judgment (Doc. 298) is **granted in part and denied in part** and Plaintiffs' motion for partial summary judgment (Doc. 303) is **granted in part and denied in part**.

IT IS FURTHER ORDERED BY THE COURT THAT Defendant Epic Landscape Productions, Inc. is dismissed as a party to this lawsuit.

IT IS SO ORDERED.

Dated: April 30, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[185] *Brown v. Wichita State Univ*., 540 P.2d 66, 73 (1975) ("A valid and binding contract is essential to the right of the third-party beneficiary to maintain such an action.").